UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

ONE PAY CLOUD, LLC,

    Debtor.

Case No. 24-10349-LMI

Chapter 11

INDIAN RIVER MERCHANT SERVICES, LLC

    Plaintiff,

v.

ONE PAY CLOUD, LLC,
TRANSACT FIRST, INC.,
I-POS SYSTEMS, LLC, and
DENOVO SYSTEMS, LLC.

    Defendants.
_____/

Adv. Pro. No.:

## COMPLAINT

Plaintiff, Indian River Merchant Services, LLC ("IRMS") by counsel hereby files this *Complaint* against One Pay Cloud, LLC (the "Debtor"), Transact First, Inc. ("Transact First"), I-Pos Systems, LLC, d/b/a Dejavoo ("Dejavoo"), and Denovo Systems, LLC ("Denovo") (collectively, the "Defendants"). IRMS seeks damages for tortious interference of contract, tortious interference of business relationship, fraud, aiding and abetting fraud, and conspiracy. In support thereof, IRMS alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

**1.** IRMS is a Florida limited liability company with its principal place of business in Largo, Florida.

**2.** The Debtor is a Delaware limited liability company, that during times relevant to this action, maintained its principal place of business in Aventura, Florida as a foreign limited

liability company authorized to do business in Florida.[1]

3. Transact First, is a Delaware corporation, authorized to do business in Florida as a foreign corporation during times material hereto, and upon information and belief, was converted from Transact First, LLC, a Delaware Limited Liability Company, during times material hereto.

4. Defendant Dejavoo is a Delaware limited liability company with its principal place of business in Wilmington, Delaware.

5. Defendant DeNovo is a Puerto Rico limited liability company, with its principal place of business is in San Juan, Puerto Rico.

6. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 157, 1332, and 1334.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## PRELIMINARY INTRODUCTION

8. IRMS is a payment processor that facilitates payments between a customer using ATMs at a merchant and the upstream bank. Such entities are a necessary part of the financial plumbing that allow merchants to offer electronic payment systems to their customers. In exchange for processing such transactions, IRMS receives a portion of the fee charged on such agreements and earns its revenue by processing hundreds of thousands of such transactions through its platforms.

9. IRMS does not process customers' requests for electronic payments alone. IRMS utilizes sponsoring banks which are required to process such transactions, and downstream merchant aggregators or brokers, also known as "ISRs" (defined below) who direct groups of merchants to process their electronic transactions through IRMS's platform. Relationships with

---

[1] The Debtor filed a certificate of withdrawal of authority to do business in Florida on June 8, 2023, with the Florida Secretary of State.

both the ISR and sponsoring banks are both necessary for IRMS's business. Without banks and networks, transactions would not be executed. Without the ISRs, IRMS would need to gather and solicit its own customers.

10. IRMS had productive contractual and business relations with both its primary ISR, EFT Services, LLC ("EFT"), and its sponsoring bank, Pueblo Bank and Trust ("Pueblo"). However, the Defendants, along with other persons or entities, conspired to interfere with IRMS's banking and ISR relationships. As part of this conspiracy, the Defendants routed illegal and fraudulent unapproved cannabis related transactions through IRMS's processing platform and through the federal banking system, resulting in IRMS forever losing its agreement with its sponsoring bank, Pueblo. Further, the Defendants worked to divert transactions (and the ensuing fee revenue) away from IRMS's platform. The diversion of transactions, and offloading merchants contractually scheduled to be processed through IRMS occurred at the same times as the Debtor and Transact First's common manager and member, Michael Shvartsman was making offers for the purchases of IRMS's business.

11. While the diversion of assets greatly decreased IRMS's revenue and viability as a company, the impairment and interference of its business relationships with Pueblo and EFT forecloses IRMS from replacing and regenerating the lost fee revenue as it can no longer process transactions without its sponsoring bank.

## FACTUAL ALLEGATIONS

### I. IRMS's Contract and Business Relationship with EFT.

#### A. Payment Systems Background.

12. IRMS is an Independent Sales Organization ("ISO"). An ISO is a payment intermediaries sponsored through banking institutions which facilitate the acceptance of

electronic payment from a merchant to the accepting bank. ISOs operate under both national and regional electronic payment processing networks.

13. ISOs operate independently but have established business relationships with banks, payment gateways and merchants. An ISO refers merchants to payment service providers so that merchants may accept credit, debit, or other forms of electronic payments.

14. Once an ISO has signed up a business to accept electronic payments on behalf of a bank, an ISO will typically get an interchange fee from the transaction with the bank. An ISO may also charge either customers or the business a percentage or fee of each transaction, otherwise known as surcharge. This fee is earned for the ISO facilitating the processing of the electronic payment at the merchant level through the sponsoring or accepting bank while meeting the regulatory and compliance requirements of the electronic payment industry. This compliance includes various regulatory requirements, applying and paying for sponsorship fees, and the sponsoring banks individualized compliance requirements.

15. While an ISO may interface with merchants directly, many utilize Independent Sales Representatives ("ISRs"). An ISR acts as brokers that give groups of merchants access to payment processing, bank sponsorship, settlement, and/or customer services in connection with ATM terminals and other hardware for processing of electronic transactions. Typically, an ISR assembles groups of merchants with electronic payment processing or ATM machines at their stores or locations into customer groups and routes the customer groups electronic merchant and ATM transactions through an ISO's processing assets.

16. Thus, while an ISO owns processing software and platforms and actively helps to facilitate the processing of electronic transactions through its systems, an ISR acts as a sales broker or support organization, assembling groups of merchants to use the ISO's services and

providing direct support to merchants.

17. Although much simpler than the actual process, the processing of an electronic payment from a customer to their bank may be understood as follows:



B. **IRMS's Contract with EFT Services, LLC**

18. On December 12, 2017, IRMS entered into the *PIN-Based Transaction Processing and Support Agreement* (the "Processing Agreement[2]") with EFT. Under the Processing Agreement, EFT was to act as the ISR and exclusively route it and its affiliates' customers' ATM transactions through the IRMS's processing assets. Under the agreement, any operator of an EFT terminal or ATM machine would charge a surcharge (the "Surcharge"). *See* Processing Agreement, pg. 9.

19. For processing each transaction, IRMS was to earn $.05 on each approved transaction, $.15 on approved cash transactions, and $1.50 on each Emerging Market Transaction. *See* Processing Agreement, pg. 18, Exhibit A, the "Transaction Pricing". Additionally, IRMS was to keep all interchange fees earned on each transaction. Below is a representative copy of the Transaction Pricing.

---

[2] Attached hereto as **Exhibit "A."**

1) Processing Costs:
   a. **Interchange:** IRMS will retain 100% of all interchange earned on all eligible transactions
   b. **Transaction Processing Fees:** IRMS will be paid a transaction processing fee in accordance with the pricing defined below. These fees will be deducted from Surcharge settlement to ISR and settled directly to IRMS via ACH.
   c. **Transaction Fee per Approved Transaction:** $.15 (for each 12 month period and adjust if market allows)
   d. **Transaction Fee per Approved Emerging Market (includes POB Fee):** $1.50
   e. **Transaction Fee per Approved Cash ATM Transaction Fee:** $.05

20. "Emerging Market" transactions were for the placement or connection of ATMs in places that did not typically already have ATMs such as vape shops, hotels, or corporate deals. EFT would aggregate these customers and then connect these ATMs with IRMS for processing.

21. While the Transaction Pricing lays out three separate types of fees, the vast majority of transactions EFT sent to IRMS for processing were purported to be Emerging Market ATM transactions, that, once approved, were subject to all three types of fees in the Transaction Pricing, leading to $1.70 surcharge fee for IRMS on each transaction processed.

22. In short, a customer would use an ATM in EFT's network which would charge a surcharge. In exchange for processing the transaction from the ATM to a bank, IRMS would earn a portion of the surcharge pursuant to the Transaction Pricing, and EFT would collect and pay same to IRMS. IRMS would also be entitled to the interchange fee on each transaction directly from the bank or network (collectively, the interchange and surcharge are the "Processing Fees").

23. Per the Processing Agreement, EFT and its affiliates agreed to exclusively process all its customers' transactions through IRMS, for a five (5) year term, that was to renew annually, unless terminated by the parties in writing. *See Processing Agreement*, pg. 12, 16.

Further, under the Processing Agreement EFT agreed to a monthly minimum transaction volume of 300,000 approved transactions. *See* Id.

24. While the Emerging Market transactions were for "non-traditional" locations, EFT and IRMS did not consider the placement of ATMs in cannabis dispensaries. Cannabis dispensaries have significant legal and regulatory impediments to access modern electronic payment systems as many credit card companies view cannabis sales as illegal transactions. Because of these impediments, dispensaries may place a cash ATM within the dispensary (as described below) or oftentimes operate a cashless ATM also known as a "Scrip machine." However, these placement and use of the machines at dispensaries has significant issues as further described below.

25. Traditional cash ATMs could be operated lawfully in cannabis dispensaries so long as **(1)** SAR[3] reporting requirements were met, **(2)** the machine was not self-loaded by the dispensary, and **(3)** not owned by the dispensary.

26. This use of cash ATMs is separate from the use of cashless ATMs, also known as Scrip machines, in cannabis dispensaries which is contrary to the Network Rules which IRMS (and all ISOs) are subject to by its sponsoring bank and network agreements. The operation of Scip machines in dispensaries is a legal gray area that facilitates billions of dollars in revenue for dispensaries each year. Card networks such as Visa and MasterCard warn against such operation which can result in substantial penalties or fines to the ISO/Processor or even termination of access to the sponsoring bank and card network.

27. As the ISR, EFT was responsible for collecting and reporting the location and transaction type for the transactions EFT sent to IRMS for processing. *See*, Processing Agreement, pg. 1 ("merchants are identified either in a data file supplied by [EFT]

---

[3] FinCEN Suspicious Activity Reporting.

contemporaneously with this agreement in an exhibit to this agreement entitled 'Description of Locations' . . . into which program the [EFT] has correctly input all data relayed to his/hers/its locations and terminals for the purposed od registration of such terminals and locations.")

28. Both cash ATM transactions and Scrip machines transactions, where the customer gets a receipt in lieu of cash are considered, "PIN based" transactions.

29. EFT provided and reported information to IRMS that reflected almost all transactions were ATM transactions that met the Emerging Market definition under the Processing Agreement. However, an investigation by IRMS revealed many of these transactions were actually transactions on "Scrip Machines"[4], disguised as regular ATM transactions.

30. The disguising of Scrip transactions as ATM transactions was contrary to the Processing Agreement, violated IRMS's agreement with its sponsoring bank, Pueblo, and was against card networks rules and regulations.

31. While it is disputed whether the use of Scrip machines in dispensaries is legal under federal law, many card companies such as VISA have issued memorandums[5] against this use as this violates banks or cards companies own internal regulations.

C. **Breach of Processing Agreement**

32. IRMS and EFT's business pursuant to the Processing Agreement operated normally for a period of years, with EFT collecting and aggregating merchants' and/or groups of cash ATM's pin-based transaction to be sent to IRMS to be processed. IRMS's primary business was the processing of ATM transactions for which it would earn $1.70 per transaction. While

---

[4] ATM SCRIP works similar to a standard atm machine, except there is no cash inside. When a customer uses an ATM SCRIP machine they swipe their card & enter their PIN as they normally would, but the machine prints out a scrip receipt of the transaction, instead of dispensing cash. The customer then gives the scrip receipt to the cashier, to pay for whatever products or services that are rendered.

[5] https://www.marijuanamoment.net/visa-warns-against-misuse-of-cashless-atms-used-by-cannabis-retailers-to-skirt-restrictions/

IRMS did operate a limited number of scrip machines in locations such as check cashing stores, it never agreed to or knowingly processed Scrip transactions in cannabis dispensaries. At $1.70 per transaction, and for hundreds of thousands of transactions a month, IRMS derived significant revenue from its operations as an ISO.

33. In or around late 2020 or early 2021, significant issues and deviations with the volume of monthly transactions processed and the surcharge earned on those transactions started. The overall volume of transactions decreased with large groups of ATMs leaving the IRMS network and sometimes returning after an unexplained absence. Further, some transactions would be processed without showing the interchange fee that was typically charged or with a surcharge different than those ATMs were typically charging. The decrease in fees charged and transactions processed led to a decline in revenue and directly correlates with the creation, operation, and activities of the Debtor.

34. On February 4, 2020, the Debtor was formed in the state of Delaware. The Debtor is 100% owned by Transact First, LLC ("Transact First") an entity owned and operated by Eric Hannelius and Michael Shvartsman. Messrs. Hannelius and Shvartsman were also the signatory and all transactions of the Debtor at times relevant to this Complaint.[6]

35. On February 10, 2020, the Debtor and Denovo entered into two agreements for certain software, more thoroughly explained in Section II of this Complaint below. The first agreement, the *Services Agreement*[7] assigned certain software and programs to the Debtor for the operation and processing of certain ATM or other transactions (the "Protocols"). Pursuant to the Services Agreement, Denovo agreed it would no longer provide other entities with access to these Protocols. In exchange, the Debtor agreed to pay Denovo $3,125,000.00 for the Protocols

---

[6] The Debtor would eventually appoint Oksana Moore as its manager immediately preceding the Petition Date.

[7] The "Services Agreement," attached hereto, with the "Side Letter" as **Composite Exhibit "B."**

and a maintenance fee of $30,000.00 a month to Denovo thereafter for the exclusive use of the Protocols. *See* Servies Agreement. The Debtor also had the option to purchase the Protocols original source code for another $2,000,000.00.

36.    A *Side Letter* to the Services Agreement states that the Debtor intended to use the software for the cannabis dispensary market, and that the exclusive use of the software developed by Denovo was strictly for the cannabis market and would not include any PIN based transactions outside of the cannabis market.

37.    In addition to the Services Agreement and Side Letter, the Debtor entered into a separate agreement on February 20, 2020, with Denovo and Dejavoo, the *Assignment of Services and License Agreements*.[8] Pursuant to the Assignment Agreement, all rights, rights, duties, and obligations under the Services Agreement were assigned from Denovo to the Debtor.

38.    That same day, the Debtor entered into a *Platform License Agreement*[9] (a "PLA") with its parent company, Transact First, for Transact First's use of a "proprietary platform" for the processing of electronic payment services. The PLA explicitly states it will provide debit, credit, and other payment services for the cannabis dispensary market.

39.    Another sub licensee of the software/Protocols now assigned to the Debtor was EFT itself, which on April 29, 2020, signed a similar PLA with the Debtor for the same use of the Denovo Protocols.

40.    On April 9, 2020, the Debtor registered in the state of Florida, and on April 23, 2020, the Debtor opened a bank account at Optimum Bank.

41.    Sub-licensees such as EFT would use their licenses of the Protocols to process ATM, Scrip machine and other electronic payment transactions at cannabis dispensaries. This

---

[8] The "Assignment Agreement," attached hereto as **Exhibit "C."**

[9] The "PLA," attached hereto with EFT's PLA as **Composite Exhibit "D."**

use of the Protocols allowed sub-licensees to disguise and send transactions to IRMS or other ISOs for processing as non-compliant transactions would be reflected as cash ATM transactions at non cannabis entities such as a nearby Burger King or as generated by a compliant cash ATM transaction at a dispensary.

42. The Debtor itself was not a licensed or registered processor of transactions itself. To spoof and complete transactions the Debtor charged sublicensees between $1.00 and $3.50 to mask cannabis transactions, adding another layer in the processing chain. After charging these fees, the sublicensees would then upstream the disguised transactions to a processing ISO who would have no idea these transactions violated their respective bank, credit card network, and contractual regulations. The Debtor thus made its money licensing out the Protocols and other software from Denovo, and then either the Debtor or the sublicensee would use a registered ISO such as IRMS entity to actually have such transactions processed.

43. The Debtor and Dejavoo were integral in allowing EFT or other ISRs to send non-compliant transactions to IRMS for processing. However, after the late 2020 sale of EFT to the Debtor/Transact First, these transactions along with likely compliant were sent to other large ISOs. The rotation of processing to other ISOs was twofold: **(i)** a new ISO would likely use a different processor, reducing the risk of the Defendants non-compliant transactions Defendants being detected and **(ii)** to divert legal transactions away from IRMS to reduce IRMS's revenue and drive down the potential offer price Mr. Shvartsman and other individuals made for the purchase of IRMS's business as further discussed below.

44. The Debtor and Transact First interfered with IRMS's relationship with EFT by forcing EFT to divert transactions away from IRMS, and to other entities or itself for processing.

In exchange the Debtor, now the sole holder of the Protocols, would then agree to process EFT's cannabis related transaction.

45. On August 20, 2020, Debtor and Transact First executed the *Asset Purchase Agreement* (the "APA") of EFT. At the time of execution of the APA, EFT was and remains subject to the exclusivity provisions of the Processing Agreement with IRMS. IRMS was not informed that EFT had been sold to Transact First/and or the Debtor.

46. Around this time, a separate individual, Bruce Garelick, began conversations with IRMS's owner for the sale of IRMS business. While general conversations continued throughout 2020, the first call IRMS had regarding the potential terms of a sale included both Mr. Garelick and Mr. Shvartsman, IRMS's first introduction to Mr. Shvartsman. As detailed above, Mr. Shvartsman is both the manager and owner of both Transact First and the Debtor and has further involvement with other entities and payment processors.

47. On November 19, 2020, the sale of EFT to Transact First was closed. Almost immediately after the November 2020 closing of EFT's sale to Transact, there was a significant decrease in the number of transactions sent from EFT to IRMS. EFT, now under the direct control of Transact and its manager, Mr. Shvartsman, breached the Processing Agreement by intentionally redirecting ATM transactions to the Debtor or other similarly owned entities, converting fees payable to IRMS, and breaching the exclusivity terms that require EFT and its affiliates to use IRMS for processing customers' transactions.

48. Sometime in the end of 2020 or beginning of 2021, the Debtor began soliciting the largest merchants and customers of EFT with false information, directly interfering with the contractual relationships between EFT and IRMS, and in furtherance of the conspiracy and scheme to harm IRMS, which was now an acquisition target of Transact or another Mr.

Shvartsman controlled entity.

49. As a direct result of the Debtor and Transact First's interference with the Processing Agreement, EFT failed to meet the minimum transaction volume situated in the Processing Agreement, further damaging IRMS. In addition to the interference with diverting transactions, the processing of disguised transactions was only possible through the software and Protocols the Debtor had exclusive license for. By June 2021, the Processing Agreement was effectively worthless as EFT, which was now controlled by the Debtor/Transact First, had cut off all transactions and refused to perform under the agreement. In less than a year terminal transaction had fallen from hundreds of thousands a month to zero, effectively ending the contractual and business relationship with EFT and jeopardizing IRMS's relation with its sponsoring bank, Pueblo.

50. Further evidencing this scheme is the Debtor and Denovo executing the *Addendum to Software Development Agreement*[10] on June 30, 2022. Pursuant to the Addendum, the Debtor agreed to remove "Verifone terminals" at the request of Denovo. Verifone terminals were terminals used by IRMS's clients in check cashing stores in accordance with the Processing Agreement. These Verifone terminals ran a special type of encryption software that was capable of working with only IRMS's systems. The removal of these terminals was for the exchange of Dejavoo' own terminals, so that the Debtor would replace the network previously in place under EFT and IRMS's processing agreement, to now generate funds for the Debtor instead of IRMS.

## II. Defendants' development and use of fraudulent masking software interfered with IRMS relationship with IRMS's sponsoring bank.

51. In addition to actively diverting and/or receiving fees for processing EFT's ATM transactions the Debtor used certain masking software to upstream cannabis related transaction

---

[10] Attached hereto as "**Exhibit "E."**"

that were illegal or violated bank and processor rules. Such fraudulent activity violated numerous provisions of the Controlled Substance Acts and federal banking laws, and this unjustified interference led to the termination of IRMS's banking relations with its sponsoring bank, Pueblo. Even if IRMS were able to retain a new ISR or platform merchants itself, it cannot do so without a sponsoring bank.

52. As discussed above, cash dispensing ATMs are only allowed at state licensed cannabis dispensaries ("SLCD's") if they meet certain reporting requirements, and they cannot be owned or operated by the dispensary itself.

53. Non-cash dispensing terminals, Scrip machines, are not allowed at the SLCDs under the card network processing rules such as Visa and Mastercard. The Defendants operations of Dejavoo's terminals by emulating and fraudulently transmitting false data in order to deceive IRMS, sponsoring banks, and the network is itself a violation of federal law[11]. As such, processing Scrip machine transactions was excluded from the use in cannabis related businesses as it would be contrary to network rules and jeopardize IRMS's ability to access the national banking system through its sponsoring banks.

54. To facilitate the spoofing or disguise of transactions, Dejavoo and Denovo had created a special software (the "Denovo Masking Software") that would disguise transactions from Dejavoo's terminals in cannabis stores and fraudulently make these transactions appear as though they were made to be from cash dispensing ATM terminals in cannabis stores, which is lawful.

55. The Denovo Masking Software was included in the software licensed and assigned to the Debtor under the Services Agreement and Assignment Agreement discussed

---

[11] See 18 U.S.C. 1956-57; 21 U.S.C. §§ 801-971. 18 U.S.C. § 1956-57 criminalizes monetary transactions involving the proceeds of any transaction that violates the Controlled Substances Act, or "Specified Unlawful Activity."

above. The Debtor would then license this to entities such as EFT, who now had a way to process electronic payments at cannabis stores that were not lawful cash ATM transactions.

56. In late 2020 and/or early 2021, EFT would process these transactions through IRMS by inputting fraudulent data into IRMS's compliance protocols, that included, without limitation, changing the name of the business where non-cash dispensing ATMs were located, as well as identifying the merchant as something other than a SLCD, to mask that EFT was operating non-cash dispensing ATMs at SLCD's in violation of both Federal Law and the Processing Agreement.

57. The fraudulent and disguised transmission of data and information through the Denovo Masking Software made it impossible for IRMS or any processor to detect the processing of non-compliant and illegal transactions through its platform. It also rendered IRMS's compliance and detection protocols useless, which would serve to degrade and ultimately destroy IRMS's relations with sponsoring banks.

58. The Dejavoo Masking Software was only designed to work on the Dejavoo Software Terminals and has no apparent lawful purpose as it only exists to conceal this unlawful activity from IRMS/other processors, their sponsoring banks, and the major network processors like Visa, MasterCard, and Discover.

59. After the Debtor's purchase of EFT, eventually all transactions (including spoofed transactions) would cease by June of 2021, however this was not until after many such illegal cannabis transactions were processed and eventually up streamed to the sponsoring banks.

60. Ultimately, on June 17, 2022, Pueblo sent the *Notice of Teremiantion*[12] informing IRMS it would be terminating its relationship as IRMS's sponsoring bank. The Notice of Termination Letter stated that after an investigation into the IRMS portfolio of ATMs, IRMS's

---

[12] Attached hereto as **Exhibit "F."**

"terminal locations are falsely transmitting transaction information to the card processing Networks. In particular, the Terminal ID, Merchant Category Code, Merchant Name, Merchant Address and Merchant State are all falsified."

61. As the ISR, EFT was the entity responsible for collecting and transmitting the above information to IRMS so IRMS could send it to its Sponsoring Bank. EFT was able to falsify such data by licensing Dejavoo's spoofing software from the Debtor.

## COUNT I:
*Tortious Interference with advantageous business relationship*

62. This is an action brought by IRMS against the Defendants for tortious interference with advantageous business relationship.

63. Plaintiff hereby realleges and fully incorporates the allegations contained in paragraphs 1 through 61 above, as though fully set forth herein.

64. A business relationship existed between EFT and IRMS that afforded IRMS existing or prospective legal rights, pursuant to the Processing Agreement.

65. Further, IRMS had or maintained business relationships with processors, banks, merchants, ISRs and other ISOs in connection with processing ATM terminals and transactions that afford IRMS existing or prospective benefits and legal rights.

66. The Defendants knew of the relationship between EFT and IRMS.

67. The Defendants knew of the relationship between IRMS and processors, banks, merchants, ISRs and other ISOs

68. The Defendants intentionally and without justification interfered with those relationships by utilizing integration software to purposely disguise transactions being processed through existing IRMS business relationships and through the diversion of lawful transactions that should have been processed by IRMS.

69. IRMS was damaged as result of the Defendants interference.

**WHEREFORE**, IRMS demands entry of a judgment against the Defendants for damages, together with interest, cost, expenses, and attorney's fees and such further relief as the Court deems just and proper.

## COUNT II:
*Tortious Interference with Contract*

70. This is an action brought by Plaintiff against the Defendants for tortious interference with contract.

71. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 61 above, as though fully set forth herein.

72. The Processing Agreement was a valid contract between IRMS and EFT.

73. IRMS had an additional valid contract with Pueblo.

74. The Defendants knew of these contracts, but intentionally and without justification interfered with Processing Agreement and banking contract and induced or otherwise caused the contractual breach of the Processing Agreement and banking contract, and IRMS was damaged because of the interference.

75. IRMS was damaged as result of the Defendants interference.

**WHEREFORE**, IRMS demands entry of a judgment against the Defendants for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the Tortious Interference of Contract and for such further relief as this Court deems just and proper.

## COUNT III:
*Fraud*

76. This is an action brought by Plaintiff against the Defendants for fraud.

77. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs

1 through 61, above, as though fully set forth herein.

78. The Denovo software licensed by the Debtor fraudulently represented the nature of transactions.

79. The disguise of the nature of these transactions was a false and material representation.

80. The Defendants were aware of the false nature of this representation and intended IRMS to rely on this representation to process transactions.

81. The Defendants directed, facilitated, or caused these fraudulently concealed transactions to be processed utilizing IRMS's business.

82. IRMS relied on this representation in allowing the transaction to be processed.

83. IRMS was damaged as result of the Defendants fraud.

**WHEREFORE**, IRMS demands entry of a judgment against the Defendants for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the Fraud and for such further relief as this Court deems just and proper.

## COUNT IV:
### *Aiding And Abetting Fraud*

84. This is an action brought by Plaintiff against the Defendants for aiding and abetting fraud.

85. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 61, and 76 through 83 above, as though fully set forth herein.

86. Defendants aided and abetted the fraudulent use of the Denovo masking software to send disguised transactions to IRMS for processing.

87. Defendants had knowledge of the underlying fraud.

88. Defendants provided substantial assistance in the commission of the fraud.

89. IRMS was damaged as result of the Defendants aiding and abetting fraud.

**WHEREFORE**, IRMS demands entry of a judgment against the Defendants for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the aiding and abetting of fraud and for such further relief as this Court deems just and proper.

### COUNT V:
*Conspiracy To Tortiously Interfere With Contract And Business Relationship*

90. This is an action brought by Plaintiff against the Defendants for conspiracy to commit tortious interference with contract and tortious interference of business relationship.

91. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 75, above, as though fully set forth herein.

92. The Processing Agreement was a valid contract and business relationship between IRMS and EFT. The agreement IRMS had with its bank was a valid contract and business relationship.

93. The Defendants knew of the contract and business relationship and tortiously interfered with same.

94. The defendants by agreement conspired to and took acts in furtherance of tortiously interfering with IRMS's contractual and business relationships.

95. IRMS was damaged as result of the Defendant's conspiracy to tortiously interfere.

**WHEREFORE**, IRMS demands entry of a judgment against the Defendants for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the aiding and abetting fraud and for such further relief as this Court deems just and proper.

### COUNT VI:
*Conspiracy To Commit Fraud*

96. This is an action brought by Plaintiff against the Defendants for conspiracy to

commit fraud.

97. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 61, and 76 through 89 above, as though fully set forth herein.

98. The Defendants had an agreement to commit fraud and committed acts in furtherance and pursuit of this conspiracy.

99. Plaintiff was damaged as a result of this conspiracy.

**WHEREFORE**, IRMS demands entry of a judgment against the Defendants for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the aiding and abetting fraud and for such further relief as this Court deems just and proper.

Respectfully submitted this 20th day of June 2024.

                        Respectfully submitted,

                        /s/ *Michael A. Stavros*
                        Michael Stavros FBN: 1033851
                        David S. Jennis / FBN: 775940
                        Jennis Morse
                        606 East Madison Street
                        Tampa, Florida 33602
                        Phone: (813) 229-2800
                        E-Mail:   djennis@jennislaw.com
                                        mstavros@jennislaw.com
                                        ecf@jennislaw.com